Eugene LANGSTON, Plaintiff–Appellant,

v.

Howard PETERS, III, Keith Cooper, Dwayne A. Clark, Lt. Ernest Clark, Gilberto Romero, Jr., and Lt. Lonnie Austin, Defendants–Appellees.

No. 95–3099.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1996.

Decided Nov. 6, 1996.

Rehearing Denied Dec. 4, 1996.

George J. Casson (argued), O'Halloran, Kosoff, Geitner & Cook, P.C., Northbrook, IL, for Plaintiff-Appellant.

Rita M. Novak, Office of the Attorney General, Chicago, IL, Brian F. Barov (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Defendants-Appellees.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

Eugene Langston was placed in protective custody after giving prison authorities information about a murder he witnessed while serving his own murder sentence at Stateville prison. Over four years later, while serving time at Joliet, Langston was placed in segregation as punishment for assaulting a correctional officer. Although Langston was in segregation, another inmate who was also serving a murder sentence was assigned to share his cell. The newly-assigned cellmate raped Langston. Langston sued numerous prison employees under § 1983 claiming they violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from being raped by another inmate, and then by providing inadequate medical treatment for the rape. The parties consented to a magistrate judge who granted defendants' motion for summary judgment, concluding that even had the rape happened as Langston claimed (and not been staged as the defendants maintained), Langston had failed to present sufficient evidence of deliberate indifference. The court also concluded that the short delay in providing medical treatment was not a violation. Langston appeals. We affirm.

## I. Background

In January 1988, while serving a murder sentence at Stateville, Eugene Langston witnessed another inmate's murder. After Langston informed Stateville's warden of what he had seen, Langston was placed in protective custody. One month later, Langston was transferred from Stateville to Joliet Correctional Center, where he remained either in protective custody or in one-man cells within segregation units.

In September 1992, Langston assaulted a correctional officer at Joliet. As punishment, Langston was placed in the north segregation unit. On November 13, 1992, Eric Rayfield, another inmate also in prison for murder, was assigned to share Langston's cell in the north segregation unit. It is unclear who decided on this assignment; Langston claims that it was Dwayne A. Clark, the assistant warden at Joliet, but Clark testified that he had delegated this function to defendant Gilberto Romero, Jr., the superintendent of Joliet's segregation unit. In either event, Joliet's warden Keith Cooper and Romero undisputedly approved the assignment, after having reviewed the prison's Offender Tracking System database and a double-celling form prepared by defendant Lonnie Austin, a Joliet correctional officer. The Offender Tracking System ("OTS") provides information concerning a prisoner's sentence, his housing status, and known enemies within the prison system. The OTS did not indicate that Rayfield and Langston were known enemies. Nor does Langston suggest that they were. Austin then placed Rayfield in Langston's cell.

Langston claims that ten days later, in the early morning hours of November 23, 1992, Rayfield assaulted and raped him. Langston alleged that at approximately 7:00 a.m. he informed Lt. Ernest Clark, a correctional officer working in the segregation unit, of the alleged rape and requested medical attention, but that Lt. Clark refused to obtain any medical treatment. Approximately an hour later, a medical technician making rounds in the north segregation unit arranged for Langston to be taken to the emergency room of the Joliet Health Care unit. He arrived at the unit at 9:30 a.m. complaining of pain and rectal bleeding, and was seen by a doctor at 10:00 a.m. The treating physician, however, found no active bleeding and no rectal tear; the physician found only microscopic

amounts of blood and diagnosed an external hemorrhoid.

Based on these facts, Langston filed suit pursuant to § 1983 against defendants Keith Cooper, Dwayne Clark, Gilberto Romero, and Lonnie Austin alleging they violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from Rayfield.[1] Langston also claimed that Ernest Clark violated his Eighth Amendment rights by denying him prompt medical attention for his injuries. The parties consented in writing to the entry of a final judgment by a United States magistrate judge pursuant to 28 U.S.C. § 636(c). The defendants then moved for summary judgment on the basis that Langston had not presented sufficient evidence of deliberate indifference to establish his claim. The magistrate judge granted summary judgment and Langston appeals.

## II. Analysis

■ We review a grant of summary judgment *de novo*. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment must establish that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To prevail, the responding party must then come forward with facts "sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

■ The Eighth Amendment, incorporated in this suit against state actors by the Fourteenth Amendment, protects against the infliction of "cruel and unusual punishment." As the Supreme Court held in *Farmer v.*

*Brennan*, 511 U.S. 825, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994), under the Eighth Amendment "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Id.* at ——, 114 S.Ct. at 1976 (internal citations omitted). "Having incarcerated 'persons [with] demonstrated proclivitie[s] for antisocial criminal, and often violent, conduct,' ... having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at ——, 114 S.Ct. at 1977 (internal citations omitted). *See also McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir.1991) (finding duty to protect prisoners from each other is "logical correlative" of the state's obligation to replace means of self-protection denied to its wards).

■ However, every injury suffered by one prisoner at the hands of another does not constitute a violation of the Eighth Amendment prohibition of "cruel and unusual punishment." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1977. Rather, an Eighth Amendment violation exists only if "deliberate indifference by prison officials effectively condones the attack by allowing it to happen...." *Haley v. Gross*, 86 F.3d 630, 640 (7th Cir.1996). Only then can "those officials ... be held liable to the injured victim." *Id.* Deliberate indifference in the prison context requires: "First, the danger to the inmate must be objectively serious, posing a substantial risk of serious harm. Second, the prison official must have a sufficiently culpable state of mind—one of 'deliberate indifference' to inmate health or safety." *Haley*, 86 F.3d at 640–41 (citing *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1977). The Court in *Farmer* emphasized the importance of "actual knowledge," "finding that because the Eighth Amendment relates only to 'punishment,' it is not enough that the official 'should have known' of a substantial risk or that a reasonable officer in the situation would have known of the risk." *Id.* (quoting *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1979).

---

1. Langston also originally sued Howard A. Peters, then Director of the Illinois Department of Corrections. On appeal Langston voluntarily withdrew his appeal of the district court's grant of summary judgment to Peters. Therefore, we need not consider that claim.

The Court in *Farmer* also emphasized that negligence is insufficient to impose liability: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1979.

 Against this backdrop, we consider Langston's case. Langston claims first that defendants violated the Eighth Amendment by assigning another inmate to share his cell. This, Langston claims, objectively created a "substantial risk of serious harm," *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1977, given that Langston had assisted prison officials in investigating a prison murder. Langston asserts that the second prong of *Farmer* was also satisfied because all of the defendants had "actual knowledge" that Langston was not to be placed in a double cell.

The evidence undisputedly establishes that Joliet officials had a policy not to place Langston in a cell with another inmate, on the one hand because he was in protective custody and on the other because he was in disciplinary segregation. Langston also presented evidence creating the inference that Joliet had established a policy that prisoners housed in disciplinary segregation would be single-celled, unless prison conditions necessitated double-celling. And it is unclear why Langston was double-celled since there were empty cells in the disciplinary unit. But ignoring internal prison procedures does not mean that a constitutional violation has occurred. Nor does it mean that placing any other inmate in Langston's cell created an "objectively substantial risk of serious harm." *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1979. True, a risk existed that someone would retaliate against Langston for cooperating with prison officials. That risk was greatest at Stateville immediately following Langston's cooperation with prison officials in January 1988. The risk of retaliation decreased when Langston was transferred to Joliet and as nearly five years intervened. We need not determine, however, if an objectively substantial risk of serious harm from retaliation existed at the time of the alleged rape in 1992 because Langston does not claim to have been raped in retaliation for his cooperation. Nor is there any evidence that he was raped in retaliation for his cooperation with prison officials. If prison officials thought Rayfield knew Langston was an informant but were deliberately indifferent to what he might do if celled with Langston, an Eighth Amendment claim would arise. But there is no claim or evidence that Rayfield knew anything about the assistance Langston provided to prison officials nearly five years previously, so retaliation is not a factor. Thus, even if the risk of retaliation was substantial, because there is no evidence that Langston was retaliated against, he was not punished so as to violate the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991) (the Eighth Amendment bans only cruel and unusual *punishment*) (emphasis in original). *See also James v. Milwaukee County*, 956 F.2d 696, 701 (7th Cir.1992) (rejecting prisoner's Eighth Amendment claim because prisoner "failed to show a causal relationship between the challenged policy and the constitutional deprivation alleged, here physical safety").

Langston claims that it is irrelevant that the alleged rape was not in retaliation for his cooperation with prison officials. In support of his position, he cites *Walsh v. Brewer*, 733 F.2d 473 (7th Cir.1984) (*Walsh I*), and *Walsh v. Mellas*, 837 F.2d 789 (7th Cir.1988) (*Walsh II*), claiming that these cases held that a prisoner could be subjected to an Eighth Amendment violation even if the attack was not in retaliation so long as the prison officials knew that the prisoner was "a member of an identifiable group of prisoners for whom risk of assault was a serious problem." 837 F.2d at 793.

Langston misreads the *Walsh* cases. In *Walsh I*, the plaintiff, a prisoner, sued prison officials after he had been attacked by a gang member. The plaintiff had previously helped prison officials quell a prison disturbance, and as a result became a target for gang retaliations. Nonetheless, he was later double-celled with a gang member who assaulted him. The district court in *Walsh I* concluded that the plaintiff did not state an Eighth Amendment claim because the assault was

not in retaliation for his cooperation with prison officials. On appeal, we affirmed in part, reversed in part and remanded. However, in doing so we did not reject the district court's conclusion that no Eighth Amendment violation had occurred because the attack was not in retaliation and thus not the cause of the injury. Rather, we concluded that the district court's analysis was incomplete because it failed to consider "the possibility that Stateville's procedures were inadequate in the protection of inmates confined in 'investigative' status against the risk of assault...." *Walsh II*, 837 F.2d at 793, *Walsh I*, 733 F.2d at 476.

As we stated in *Walsh II*, our decision in *Walsh I* was "tailored to the situation where a prison's practices and *procedures* for screening the files of inmates assigned to investigative status to determine their involvement in gang-related activities arguably violate the Eighth Amendment." 837 F.2d at 797. In *Walsh II*, we upheld the district court's conclusion that the prison policies and procedures violated the Eighth Amendment because the evidence established that gang activity at Stateville was a serious security problem, known by the defendants, and that the plaintiff was a targeted inmate. Nevertheless, Stateville failed to institute reasonable screening procedures and safeguards to protect the safety of prisoners from the risk of gang-related violence. 837 F.2d at 797. Thus, the prisoner was "a member of an identifiable group of prisoners for whom risk of assault was a serious problem." 837 F.2d at 798. We upheld the district court because "there was 'considerable evidence respecting the frequency of assaults ... and that the risk of assault by gang members upon inmates targeted by gangs was real and significant,'" yet Stateville had failed to implement a good-faith screening procedure. *Id.* at 799.

In contrast, here there is no evidence that Joliet had a problem with gang assaults or retaliation or that risk of gang assault or retaliation was "real and significant." Nor is there evidence that Langston was targeted by a gang. He makes no such claim. In fact, at some point Langston and Rayfield were members of the same gang. Finally, in contrast to the facts in *Walsh*, here Joliet had instituted a reasonable screening procedure to protect inmates. This included the completion of a double-celling form and the review of the OTS which provides information concerning the prisoner's sentence, his housing status, and known enemies within the prison system. Thus, this case does not fit the specially tailored Eighth Amendment claim involved in *Walsh* where the evidence established a serious security problem known by prison officials and a failure to institute screening procedures to protect the targeted group of prisoners from a real and significant risk of assault.

Langston argues alternatively that the Joliet defendants violated his Eighth Amendment rights by placing him in a cell with Rayfield, given that Rayfield had earlier sexually assaulted a cellmate. Even if the fact that a convicted murderer sexually assaulted a cellmate on one occasion is sufficient to establish a substantial risk of harm to all other inmates and thus requires him to be single-celled, Langston failed to present any admissible evidence that the prison defendants who assigned Rayfield to Langston's cell knew of the previous attack.[2] The prison defendants reviewed the OTS report; Rayfield's assault did not appear on this report.

■ We also reject Langston's claim that the failure of the OTS to include information of Rayfield's assault constituted deliberate

2. On appeal, Langston's attorney cites a portion of Langston's deposition as evidence that the defendants knew that Rayfield had a history of sexually assaulting his cellmates. Specifically in his deposition Langston stated: "Lieutenant West .... he says damn, they're stupid, they know they wasn't supposed to put you and that boy in the same cell together, and I said why to West, why do you say that, Lieutenant West, and he said because they already know the boy has a history of assaulting his cellies." However, in his statement to Langston, West did not identify who "they" were. And when asked specifically if defendants Cooper and Dwayne Clark knew that Rayfield had a history of raping his cellmates, Langston stated "I'm not going to go as far as to say that...." The only defendant who Langston testified actually knew of Rayfield's history was Ernest Clark, but Ernest Clark had nothing to do with the decision to double-cell Rayfield and Langston. Thus, hearsay objections aside, this evidence fails to create a genuine issue of material fact as to whether the defendants knew of the single sexual assault in Rayfield's history.

indifference. Again Langston cites *Walsh.* But, as explained above, *Walsh* found an Eighth Amendment violation only where evidence established a serious security problem known by prison officials. The violation was a failure to institute screening procedures to protect the targeted group of prisoners from the resulting real and significant risk of assault of which the officials were aware. Langston has failed to present any evidence that there existed at Joliet a serious risk of sexual assault, or that he was within a group targeted for such assaults. In fact, the district court stated "[f]or whatever reason, Langston has chosen not to pursue this theory of recovery." [3] Therefore, he cannot succeed under the theory presented in *Walsh.*

Langston's final Eighth Amendment claim is against Ernest Clark. Langston claims that when he informed Ernest Clark that he had been raped, instead of obtaining immediate medical treatment Clark told him that he would have to work it out himself. It was another hour before Langston was able to pass a note to a medical technician, who arranged for him to be transferred to the emergency room of the Joliet prison. Langston claims that Clark disregarded an excessive risk to his health and thereby violated the Eighth Amendment. *Farmer,* 511 U.S. at ——, 114 S.Ct. at 1979.

The Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), concluded that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." *Id.* (internal quotation omitted). As *Estelle* recognized, a prison official may evidence deliberate indifference by failing to treat or delaying the treatment of a serious medical need. However, for liability to exist the medical need must be objectively serious. *Farmer,* 511 U.S. at ——, 114 S.Ct. at 1977 ("First, the deprivation alleged must be objectively 'sufficiently serious.'") (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)). Rape is clearly a severe injury. If Langston was raped, as he claims, and not trying to extort money from the state, as prison officials claim, Lt. Clark's response was wholly inappropriate. But that alone does not make it a constitutional violation. No matter his motives, Clark's failure to obtain immediate medical care for Langston constitutes an Eighth Amendment violation only if the delay was "objectively, sufficiently serious" to constitute the "denial of the minimal civilized measures of life's necessities." *Farmer,* 511 U.S. at ——, 114 S.Ct. at 1977. Here Clark's failure to respond to Langston's complaint resulted in a one-hour delay. We have held in the past that a two-hour delay is not an unreasonably long wait for an x-ray, an examination, and possibly a set of a fracture. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995). In fact, the public often waits longer at hospital emergency rooms. Moreover, we agree with the Eighth Circuit that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995) (emphasis added). *See also Martin v. Tyson,* 845 F.2d

---

**3.** Specifically, the district court stated:

This Court recognizes, however, that Langston could argue, based on *Walsh II,* that Rayfield was a member of an identifiable group of dangerous inmates—sexual assaulters—and that sexual assault among inmates was a pervasive problem.

Rayfield had a history of one sexual assault in prison. It also appears that Defendants' policy of reviewing only the OTS database, to determine compatibility for double-celling, was insufficient to discover Rayfield's disciplinary history. Thus, a complaint of deliberate indifference based upon *Walsh II* might have been made by alleging that: (a) there was a pervasive known risk of sexual assault; (b) by repeat offenders; and (c) Joliet had a policy of exclusively checking the OTS database to determine inmate compatibility, and failed to review the inmates' files. *Cf. Walsh II,* 837 F.2d at 798. For whatever reason, Langston has chosen not to pursue this theory of recovery. Nothing in his Amended Complaint or the pretrial order indicates that these are elements he will attempt to prove at trial. In particular, Langston has not shown that he is a member of a target group or that rape was pervasive at Joliet. Since neither party has addressed this policy theory, the Court declines to express an opinion as to its viability.
*Langston v. Peters,* 1995 WL 461912, *7 (N.D.Ill. Aug. 2, 1995).

1451, 1458 (7th Cir.1988) (rejecting Eighth Amendment claim for delay in treatment in part because prisoner failed to produce any evidence of injury caused by the delay). Langston has failed to present any evidence of a detrimental effect caused by the one hour between the time Langston notified Clark and the time he notified the medical technician. In this case, the rape had already occurred. Clark could do nothing to change that. Apart from the rape, there is no evidence that as a consequence of the assault Langston suffered from a serious injury which required immediate treatment. The record reveals that when a doctor examined Langston later that morning he found no active bleeding and no rectal tear; Langston was diagnosed with an external hemorrhoid and microscopic amounts of blood. Under these circumstances, the one-hour delay Langston suffered from Clark's inaction is insufficient to reach constitutional proportions. *See Hill v. Dekalb Reg. Youth Det. Center,* 40 F.3d 1176, 1190 (11th Cir.1994) ("Whatever injury was caused by the regrettable, reprehensible sexual assault that occurred approximately twelve hours earlier ... could not have been alleviated by [defendant], even if she had transported [plaintiff] to a hospital immediately upon learning of blood in his underwear.").

### III. Conclusion

Based on the record, the defendants are entitled to summary judgment on Langston's Eighth Amendment claims. Even if an objectively substantial risk existed that someone would retaliate against Langston for cooperating with prison officials, he was not retaliated against, so there was no punishment. The prison defendants also did not know of Rayfield's history of sexual assault, so even if Rayfield presented an objectively substantial risk of serious harm, the prison defendants cannot be said to have been deliberately indifferent to that risk. Finally, the delay in obtaining treatment for Langston does not rise to a constitutional level because on these facts it must be concluded that immediate attention was not necessitated by a serious medical need and because he was treated shortly thereafter, and did not suffer

any injury from the delay. For these and the foregoing reasons, we AFFIRM.