**Hubert HILL, Plaintiff,**

v.

**Salvador A. GODINEZ, Mark Franklin, and Arthur Brewer, M.D., Defendants.**

**No. 94 C 4499.**

United States District Court, N.D. Illinois, Eastern Division.

Feb. 6, 1997.

Hubert D. Hill, Menard, IL, pro se.

Vincent J. Vigil, Vigil, Berkley & Gordon, P.C., Skokie, IL, for Hubert D. Hill.

Sebastian N. Danziger, Illinois Attorney General's Office, Chicago, IL, Susan Takata O'Leary, Illinois Dept. of Corrections, Chicago, IL, for Salvador Godinez and Mark Franklin.

Sebastian N. Danziger, Illinois Attorney General's Office, Chicago, IL, for A. Brewer.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Hubert Hill ("Hill") originally sued defendants Salvador Godinez ("Godinez"), Mark Franklin ("Franklin") and Dr. Arthur Brewer under 42 U.S.C. § 1983 ("Section 1983") for failing to protect Hill from physical harm and for denying him essential medical treatment during his incarceration at Stateville Correctional Center ("Stateville") in 1992. Hill has since withdrawn his claims against Godinez, and both remaining defendants have now moved for summary judgment. For the reasons set forth in this memorandum opinion and order, the motion is granted as to Hill's denial-of-medical-treatment claim against Dr. Brewer but is denied as to Hill's failure-to-protect claim against Franklin.

### Facts

Hill, who has been incarcerated at various prison facilities within the Illinois Department of Corrections since 1984, was at Stateville from September 2, 1992 to June 22, 1994. At the time of the relevant events Franklin was a counselor in the protective custody unit and Dr. Brewer was Medical Director.

Before he arrived at Stateville Hill had had several prison run-ins with gangs, including among others the North Siders and the Gangster Disciples. For example, in August 1984 he had been placed in protective custody at Menard Correctional Center ("Menard") after he turned in two homemade knives that the North Siders had demanded he make. In February 1987 he was again placed in protective custody there when, as a member of a "prison biker gang" known as the Menard Brotherhood, he refused an order to stab another inmate. In December 1988 he was placed in protective custody yet again after revealing that the North Siders were once more demanding that he make homemade knives.

Shortly after that Hill became indebted to a member of the Gangster Disciples to the tune of $250 after losing at poker. As a result of that gambling debt, the Gangster Disciples threatened him on several occasions from December 1988 until March 1989. Hill was then transferred to Pontiac Correctional Center ("Pontiac") and was placed in protective custody after reporting his past problems with gangs, including the gambling debt. Hill remained in protective custody at Pontiac until he was transferred to Graham Correctional Center in October 1989.

In January 1990 Hill was sent to Hill Correctional Center ("HCC"), where members of the Gangster Disciples knew about the gambling debt and tried to get him to make "hooch" to pay it off. Hill reported their demand to prison officials and was placed in protective custody. Two years later, after several additional transfers, Hill arrived at Illinois River Correctional Center ("Illinois River"). There a member of the Menard Brotherhood threatened his life. After Hill reported the incident, he was granted a transfer out of Illinois River. Hill arrived at Stateville in September 1992, where he requested placement in the protective custody unit.

On September 14, 1992 Franklin interviewed Hill about his protective custody request. Just what information Hill gave to Franklin is disputed. According to Hill, he told Franklin about his past placements in protective custody at other facilities and about the gambling debt, and he also said that the Gangster Disciples had a "hit"[1] on him. According to Franklin, Hill said only that three years earlier at Menard he had an altercation with the "Folks" (which Franklin understood to mean an unidentified gang) while drunk and that the Folks had a "hit" on him. Franklin contends that he did not determine until after the interview that the Folks were the Gangster Disciples.

After the interview, Franklin reviewed Hill's "rather large" prison file for about 15 minutes. Whether he read the forms relating to Hill's past placements in protective custody is not clear. In any event, based upon his observation of Hill's physical size and his demeanor during the interview (Hill is not of small stature and did not appear frightened), Hill's inability to identify specifi-

---

1. Franklin acknowledged his understanding (Franklin Dep. 70) that a "hit" meant "an inmate fear[ed] that there might be a reprisal of physical violence against him by a certain group."

cally any inmate at Stateville who was a threat to him and Hill's level of "institutional sophistication" (that is, his experience with prison life), Franklin denied Hill's request.

That resulted in Hill's placement in Unit X, where inmates who had been denied protective custody were housed while they appealed that decision to the Prison Review Board. There Hill was placed on an eight-cell gallery in which each cell housed two inmates. Hill was familiar with gang colors, symbols and clothing, and on that basis he recognized one of the two inmates already in his gallery as a Gangster Disciple. In the days that followed three more Gangster Disciples were assigned to the gallery until all the cells had been filled.

On October 11, 1992 the inmates in Hill's gallery were released from their cells for "Day Room," a recreation period. Cells in Unit X had to be unlocked by a guard with a key, and for Day Room recreation that was done in such a manner that all inmates in a gallery were released from their cells into the hallway virtually simultaneously. That day two inmates assaulted Hill and three others assaulted his cellmate. One of the two inmates who attacked Hill was known to prison authorities as a Gangster Disciple, but the other had no reported gang affiliation.

Hill suffered a broken nose and numerous cuts and bruises. He was taken to the Stateville Health Care Unit ("Health Care") for treatment and remained there for ten days. When he first saw a doctor the day after the assault, that doctor recommended that he be seen by an ear, nose and throat specialist for treatment of a broken nasal bone. On October 16, 1992 Hill was seen by such a specialist, Dr. Robert J. Kramer, who prescribed nasal surgery. He noted in Hill's chart that Hill had a nasoseptal fracture with an obstruction on the left side and would need a septoplasty. Dr. Kramer also told the Health Care staff that Hill should have the surgery within seven or eight days so that the broken bone in Hill's nose would not set on its own, failing which prompt surgery the bone would have to be re-broken during any later surgery. That request was recorded by a Health Care staff member.

Hill swears that he saw Dr. Brewer on October 21 and November 4, 1992 and told him of Dr. Kramer's recommendation of prompt surgery. Dr. Brewer denies that he saw Hill on those occasions and contends that he first learned of and approved Dr. Kramer's recommendation on November 18. Shortly thereafter Hill contracted an eye infection that required postponement of the surgery. There is a dispute as to when the eye infection cleared up: Hill says it was on January 8, 1993, while defendants contend it was March 26, 1993. Hill further says that he sent Dr. Brewer a letter about the surgery in February 1993, enclosing a copy of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Hill did not have the septoplasty until April 6, 1993, and his nasal bone had to be re-broken during the operation, something that Hill claims caused him additional pain. It is undisputed that Hill's nose has healed completely and that he suffers no permanent damage to it.

Hill's Third Amended Complaint ("TAC") sets out a claim of failure to protect against Franklin (Count I) and failure to provide adequate medical care against Dr. Brewer (Count II). Although the TAC was framed against defendants in both their official and individual capacities, Hill has withdrawn his official-capacity claims as barred by the Eleventh Amendment. Hill has also withdrawn an intentional infliction of emotional distress claim (Count III).

### Summary Judgment Principles

Rule 56(c) permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." For that purpose this Court does not weigh the evidence submitted by the parties or determine the truth where a conflict exists (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). All facts must be viewed and all reasonable inferences drawn in the light most favorable to the non-movant (*Transamerica Ins. Co. v. South*, 975 F.2d 321, 327 (7th Cir.1992)). "If no reasonable

jury could find for the party opposing the motion, it must be granted" (*Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995), citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

Under those principles each defendant's Rule 56 motion will be viewed through a lens favoring Hill. This opinion will first address Franklin's motion, then will turn to Dr. Brewer's.

### Failure To Protect Hill

■ Under the Eighth Amendment[2] "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners" (*Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)). But "an Eighth Amendment violation exists only if 'deliberate indifference by prison officials effectively condones the attack by allowing it to happen'" (*Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir.1996), quoting *Haley v. Gross*, 86 F.3d 630, 640 (7th Cir.1996)). *Langston, id.*, again quoted *Haley* to amplify that standard:

> Deliberate indifference in the prison context requires: "First, the danger to the inmate must be objectively serious, posing a substantial risk of serious harm. Second, the prison official must have a sufficiently culpable state of mind—one of 'deliberate indifference' to inmate health or safety." *Haley*, 86 F.3d at 640–41 (citing *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977).... "[I]t is not enough that the official 'should have known' of a substantial risk or that a reasonable officer in the situation would have known of the risk." *Id.* (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979).

In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference" (*Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979). "In failure to protect cases, '[a] prisoner normally proves actual knowl-edge of impending harm by showing that he complained to prison officials about a specific threat to his safety'" (*Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir.1996) (per curiam)).

■ Franklin argues that he is entitled to summary judgment because Hill cannot establish an Eighth Amendment violation as to his being denied protective custody. Franklin contends that his decision not to place Hill in protective custody was reasonable based upon the information that Hill provided during the interview. But what Hill actually told Franklin during the interview is disputed, and so Franklin's argument succeeds only if this Court accepts his version of the facts. That would turn matters on their head: It is Franklin who has moved for summary judgment, requiring that Hill's version be credited for now. It will be recalled that according to Hill he told Franklin about his history of placement in protective custody, about his gambling debt owed to the Gangster Disciples and about the gang's "hit" on him. It is undisputed both that Franklin was aware that there were many Gangster Disciples in the prison population at Stateville and that he knew what a "hit" was.

This case contrasts sharply with a situation (as in *Langston*, 100 F.3d at 1238) in which an inmate was assaulted at random under circumstances in which prison officials had no way of knowing that the inmate would be targeted. Based upon Hill's evidence that he told Franklin not only about his peril from the Gangster Disciples but also about his history of protective custody, it may reasonably be inferred that he informed Franklin about the Gangster Disciples' past effort to force him to make "hooch" at HCC as repayment of the gambling debt as well.

In short, Hill apparently did everything except identify by name the specific Stateville inmates who were likely to assault him. As a result of Franklin's denial of Hill's request, Hill was assigned to Unit X and placed in a cell near several Gangster Disciples, including one whose gang affiliation was

---

**2.** In accordance with the uniform practice exemplified by *Farmer,* this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

recorded in his prison file. It was that inmate who assaulted Hill when the inmates were released from their cells at the same time. Hill has surely tendered enough evidence to establish (at a minimum) that there is a genuine issue of material fact as to whether Franklin was deliberately indifferent to a substantial risk of serious harm to Hill. That compels the rejection of Franklin's summary judgment motion as a factual matter.

■ Franklin also contends that he is sheltered from liability by qualified immunity. Given the clearly established principles of deliberate indifference in the failure-to-protect context at the time that Franklin acted (see *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987)), he cannot succeed on qualified immunity grounds. No new legal trails have been blazed such that Franklin's deliberate indifference is being evaluated ex ante. Hill had a clearly established right not to be subjected through a correctional officer's deliberate indifference to a risk of serious harm from fellow prisoners, such as in the circumstances involved here (see, e.g., the numerous pre–1992 cases cited in *Farmer*, 511 U.S. at 833 & n. 2, 114 S.Ct. at 1977 & n. 2; and see *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1173 (7th Cir.1997) for the most recent restatement of the qualified immunity test by our Court of Appeals).

■ This Court has already concluded that a rational factfinder could conclude that Franklin was deliberately indifferent (in the sense that was already established before October 1992) to a substantial risk of serious harm to Hill—because he did not take reasonable steps in response to that known risk. Surely a reasonable officer in Franklin's position had to understand that what he did violated Hill's already-defined and clearly established constitutional right. That being so, as aptly summarized in *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir.1992):

A finding of deliberate indifference necessarily precludes a finding of qualified immunity.

Franklin's motion is therefore denied as to Count I. That facet of Hill's lawsuit must go to trial.

### Denial of Medical Care

■ Prison officials' obligations to inmates under the Eighth Amendment also prohibit their "deliberate indifference to serious medical needs of prisoners" (*Estelle*, 429 U.S. at 104, 97 S.Ct. at 291). Dr. Brewer argues among other things that Hill's claim against him is barred by the two-year statute of limitations applicable to all Illinois-based Section 1983 actions (see *Kalimara v. Illinois Dep't of Corrections*, 879 F.2d 276, 277 (7th Cir.1989) (per curiam)). This opinion addresses only that issue because it is dispositive of the claim.

■ Resolution of the question whether Hill's claim is timely depends upon when it accrued. Federal law, which determines when a Section 1983 claim accrues (*Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir.1992)), teaches (*id.* (citation omitted)):

Generally, a claim accrues when the plaintiff knows or has reason to know of the injury giving rise to the cause of action. Civil rights claims, therefore, accrue when the plaintiff knows or should know that his or her constitutional rights have been violated.

As stated earlier, Dr. Kramer examined Hill on October 16, 1992 and prescribed a septoplasty, recommending that the surgery be performed within seven or eight days. Hill admittedly knew of that recommendation, for he claims to have informed Dr. Brewer about it on October 21 and November 4. Indeed, it will be remembered that Hill contends that in February 1993 he sent Dr. Brewer a letter inquiring about the surgery and enclosing a copy of *Estelle*. Yet Hill first named Dr. Brewer as a defendant in this action on March 23, 1995.

Hill's *Estelle*-based claim of deliberate indifference to his serious medical needs can only be read as challenging Dr. Brewer's failure to provide the surgery within the time frame recommended by Dr. Kramer, for it is undisputed that the surgery was eventually performed. It was on October 16 (the only

day that he saw Hill) that Dr. Kramer recommended that the surgery be done within seven or eight days. Because Hill knew of that recommendation not later than October 21 by his own admission, he necessarily knew before the end of October that the surgery had not been performed at the time recommended. And he did not sue Dr. Brewer until well over two years (nearly 2½ years) later.

Hill attempts to escape the limitations bar by making two arguments. First his Mem. 14 contends:

> There remains a question of fact as to whether, at such an early date, the Plaintiff had knowledge of the physical suffering he would endure as occasioned by Brewer's denial of necessary medical care, and whether the Plaintiff had the requisite knowledge as to the causal connection between his suffering stemming from a denial of medical care, and the denial itself.

That argument is both circular and incoherent. Apparently Hill is contending that he somehow did not know in October 1992 that the pain "stemming from" a denial of medical care was caused by the denial of medical care. That of course is untenable, because "stemming from" is synonymous with "caused by." Moreover, because it is undisputed that Hill knew that he did not receive the surgery within the time frame recommended by Dr. Kramer, the cause of his pain necessarily must have been obvious to him— in *Wilson's* terms, he then "kn[e]w or ha[d] reason to know of the injury giving rise to the cause of action." That was enough to trigger the commencement of the limitations period.

■ Hill's Mem. 14–15 next urges that Dr. Brewer's failure to provide the surgery throughout the period from October 24, 1992 to April 6, 1993 (with the exception of the period when Hill suffered from the eye infection) constituted a continuous course of long-term negligent medical treatment, so that the limitations clock did not begin to tick until the surgery took place. Even apart from the fact that *negligent* treatment does not give

rise to a Section 1983 claim to begin with,[3] the fallacy of Hill's argument is that such a deferral of medical treatment is not itself a form of treatment (negligent or otherwise)— it is rather the absence of medical treatment.

Here Dr. Brewer did not engage during that time frame in some form of treatment of Hill's broken nose. Instead—even on the premise favorable to Hill's position—Dr. Brewer failed to ensure that Hill received treatment within the short time needed to avoid the re-breaking of Hill's nose. Thus there was no "last date of medical treatment" other than the October 1992 date, as Hill posits. Once Dr. Brewer failed to ensure that the surgery was performed within the recommended time frame, the die was cast— Hill's claim had accrued, and the lapse of more time before the actual surgery took place became irrelevant.

It is clear from the undisputed facts that Hill knew of the assertedly unconstitutional denial of medical treatment more than two years before he brought suit against Dr. Brewer, and his claim against Dr. Brewer is therefore barred by the statute of limitations. Dr. Brewer's motion for summary judgment is granted as to Count II.

### Conclusion

Hill's claims in the Third Amended Complaint against Salvador Godinez and against all defendants in their official capacities have been withdrawn. Hill's intentional infliction of emotional distress claim (Count III) has also been withdrawn.

There is no genuine issue of material fact as to Hill's Count II claim, and Dr. Brewer is entitled to a judgment as a matter of law on that claim. Count II is therefore dismissed. But the existence of factual issues compels the denial of Franklin's motion on Count I. At the status hearing previously scheduled for February 10, 1997 the parties should be prepared to discuss:

1. whether a Rule 54(b) determination should be made as to the dismissed claims and parties (see *National*

---

**3.** *Estelle* and its progeny emphasize that the "cruel and unusual punishment" prohibition of the Eighth Amendment is not breached by mere medical malpractice—by mere negligence (see, e.g., *Sellers v. Henman,* 41 F.3d 1100, 1102 (7th Cir.1994)).

*Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)); and

2. what procedures remain to bring the still-surviving Count I claim to trial.