In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-3493

DAVID WILLIAMS,

*Plaintiff-Appellee,*

*v.*

JAMES LIEFER, BRENT HOFFMAN,
and JAMES MASSEY,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01 C 986—**William D. Stiehl**, *Judge.*

---

ARGUED MAY 25, 2007—DECIDED JULY 5, 2007

---

Before BAUER, CUDAHY, and FLAUM, *Circuit Judges.*

FLAUM, *Circuit Judge.* David Williams sued several employees of the Illinois Department of Corrections under 42 U.S.C. § 1983, claiming that they were deliberately indifferent to his medical needs in violation of the Eighth and Fourteenth Amendments. On July 5, 2006, a jury returned a verdict in favor of Williams and awarded him $4,500 in compensatory damages. The defendants appeal, claiming that they were entitled to judgment as a matter of law. For the following reasons, we affirm the jury's verdict.

## I. BACKGROUND[1]

David Williams, an obese inmate who suffers from high blood pressure, was housed in the segregation building of Menard Correctional Center in Menard, Illinois. On October 27, 2000, Williams was scheduled to be transferred from the segregation unit to protective custody in the general population. On that day around 6:30 a.m., Williams awoke with chest pain, numbness in his left arm, and dizziness. He also felt nauseous and began vomiting.

Around 7:00 a.m., Williams complained about his symptoms to Officer James Massey, who was doing the morning cell count, but Massey did not respond and continued walking down the gallery. After Massey finished the count, he walked past Williams' cell again, and Williams said, "Officer Massey, man, I'm having chest pain real bad, try to get me help or something." Massey reminded Williams that he was getting out of segregation that day and told him that he should wait until the transfer was completed.

Around 10:30 a.m., Massey escorted Williams, in handcuffs, down four flights of stairs to the segregation building's exit. Massey uncuffed Williams and placed his personal property on a push cart. Williams asked Massey if he could see a medical technician before he left the building, but Massey denied the request, telling Williams to speak with someone from the property building. Several officers escorted Williams and six other inmates as they pushed the carts containing their personal property from the segregation building to the property building, which was approximately 100 yards away.

---

[1] We recount the facts in the light most favorable to the jury's verdict.

At the property building, Williams told Officer Brent Hoffman that he was having chest pains, his arm was numb, and he was sick. Williams was sweating profusely and asked to see a doctor or paramedic. Hoffman ignored Williams' request for medical attention, instructing him to help the other inmates retrieve their belongings. Williams retrieved additional property from the building and placed his property box, which weighed approximately 200 pounds, onto his cart. As he was loading the cart, Williams repeated that he was in a lot of pain, but Hoffman simply told Williams to push his cart.

From there, Williams pushed his cart 200-250 yards to the clothing building and then pushed it another 100 yards to his cellhouse. Williams was then required to carry his box of personal property to his cell. As he walked through the cell gallery carrying the heavy box, Williams began to feel lightheaded and his pain level increased. Williams spotted Officer Liefer, who had summoned a paramedic for him on a prior occasion. He asked Liefer to "holler at the Sarge," and said that he was experiencing bad chest pain. Liefer did not respond, so Williams asked him for help carrying his belonging up the stairs. When Liefer refused, Williams showed him an identification card, which stated that Williams suffered from chronic hypertension. Still, Liefer did not get Williams medical attention or help him carry his property box.

At approximately 1:00 p.m., Williams began carrying his box of personal property up fifteen stairs to his cell. As he climbed the stairs, he blacked out and fell backwards down the stairs. Medical technicians responded and sent Williams to the prison emergency room, where, around 1:30 p.m., he received nitroglycerin, which quickly relieved his pain.

At the hospital, Williams rated his pain an eight out of ten. His blood pressure was 159/100 (120/80 being nor-

mal), and his pulse was 104 beats per minute (an adult's resting heart rate should fall between 60 and 100 beats per minute). Medical personnel took Williams' electrocardiogram ("EKG"), and it indicated an abnormal heart rate. The examining physician, Dr. Stephen C. Doughty, diagnosed Williams with chest pain and hypertension. Williams' blood pressure decreased after about an hour, but he remained in the infirmary for six days.

To treat Williams' condition, Dr. Doughty recommended dietary restrictions and prescribed Williams several medications: Lasix, a diuretic; Catapres, an anti-hypertension medicine; Lanoxin, a cardiac medication; Captopril, another anti-hypertension medicine; and a potassium supplement. Another doctor prescribed Isordil, a medicine for low blood flow. A second EKG revealed that Williams had a first-degree AV block, which could signify either coronary artery disease or acute hypertension.

On December 18, 2001, Williams filed suit against the Department of Corrections and various individual defendants under 42 U.S.C. § 1983, claiming that the delay in treatment violated his Eighth Amendment rights. On June 28, 2006, a three-day jury trial commenced. During the trial, Dr. Doughty testified that any delay in treatment "[did not] appear to have had any significant adverse effect" on Williams' condition. Williams testified that, as a result of his October 27, 2000 injuries, he could not walk long distances or work on a job, meaning he could not earn money in prison.

At the close of the trial, the defendants moved for judgment as a matter of law, claiming that any delay in treatment did not harm Williams and that the officers were entitled to qualified immunity. The district court denied the motion, and the jury returned a verdict in favor of Williams and against Liefer, Massey, and Hoffman. It awarded Williams $4,500 in compensatory dam-

ages. After the entry of judgment, Liefer, Massey, and Hoffman renewed their motion for judgment as a matter of law, and, in the alternative, asked for a new trial. The district court denied the renewed motion, and the defendants appeal.

## II. ANALYSIS

The defendants argue that they are entitled to judgment as a matter of law. Specifically, they contend that Williams offered no verifying medical evidence that the delay in treatment harmed him, and they contend that they are entitled to qualified immunity. In the alternative, they request a new trial.

### A. Evidence of Harm

This Court reviews the denial of the defendants' motion for judgment as a matter of law de novo. *Erickson v. Wis. Dep't of Corrs.*, 469 F.3d 600, 601 (7th Cir. 2006). We consider whether the evidence presented, drawing all reasonable inferences in favor of the non-movant, was sufficient to support the verdict. *Davis v. Wis. Dep't of Corrs.*, 445 F.3d 971, 975 (7th Cir. 2006). The Court will disregard any evidence that was favorable to the defendants that the jury was not required to believe, but it must give credence to evidence that was uncontradicted and comes from disinterested witnesses. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150-51 (2000). The verdict should be overturned only if no reasonable jury could have found in Williams' favor. *Erickson*, 469 F.3d at 601.

The Supreme Court has interpreted the Eighth Amendment's prohibition of cruel and unusual punishment, incorporated through the Fourteenth Amendment, as

imposing a duty on states to provide medical care to incarcerated individuals. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Id.* at 104. A claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition, and 2) an official's deliberate indifference to that condition. *See Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006). An objectively serious medical need includes both diagnosed conditions requiring treatment and conditions "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (internal quotation and citation omitted).

In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer "verifying medical evidence" that the delay (rather than the inmate's underlying condition) caused some degree of harm. *See, e.g.*, *Petty v. County of Franklin, Ohio*, 478 F.3d 341, 344 (6th Cir. 2007); *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005); *Surber v. Dixie County Jail*, 206 Fed. App'x 931, 933 (11th Cir. 2006). That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental.

This Court adopted the verifying medical evidence requirement in *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (citing *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995). In *Langston*, the plaintiff claimed that a one-hour delay in medical treatment after he was raped by another inmate violated the Constitution. 100 F.3d at 1240. We affirmed summary judgment in favor of the defendants because the plaintiff did not produce any evidence that the one-hour delay had a detrimental

effect; the rape had already occurred, and there was no evidence that it had caused any serious physical injury. *Id.* at 1241. We did not, however, articulate what qualified as verifying medical evidence.

The parties dispute whether Williams offered sufficient verifying medical evidence in this case, and they disagree about what constitutes verifying medical evidence. While the defendants claim that expert testimony is the only acceptable form of verifying medical evidence, Williams claims that his testimony, his medical records, and his treatment are sufficient to show the delay's detrimental effect. Clearly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement. *See, e.g.*, *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997) (concluding that expert testimony satisfied the verifying medical evidence requirement). On the other hand, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him. *See Laughlin,* 430 F.3d at 929.

The evidence in this case falls somewhere in between a bare recitation of treatment received and expert testimony about the delay's effect. Williams' medical records and Doughty's testimony showed that when Williams arrived at the hospital, he had elevated blood pressure, had an abnormal EKG, was sweating, and complained of severe pain. The medical records also showed that with treatment, Williams' symptoms, including his pain and high blood pressure, quickly subsided. The only testimony from a medical expert, Dr. Doughty, was that the delay did not appear to have adversely affected Williams' condition.[2]

---

[2] The defendants contend that this Court must credit Doughty's testimony because it was uncontradicted testimony from a

(continued...)

Although no jury could determine, based on this record, whether it was the delay in care or the underlying condition that necessitated Williams' treatment or affected his ability to work, a reasonable jury could have concluded from the medical records that the delay unnecessarily prolonged and exacerbated Williams' pain and unnecessarily prolonged his high blood pressure. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (recognizing that "hours of needless suffering" can constitute harm). The medical records indicate that the nitroglycerin almost immediately relieved his pain and lowered his blood pressure, so a jury could find that the defendants' delay caused Williams six extra hours of pain and dangerously elevated blood pressure for no good reason. Accordingly, we affirm the district court's denial of judgment as a matter of law.[3]

---

[2] (...continued)
disinterested witness. *See Reeves*, 520 U.S. at 150. They argue that although a prison employee generally is not a disinterested witness, *see Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999), Doughty was not a typical employee because 1) he was employed by an independent medical vendor contracting with the Department rather than the Department itself, 2) he no longer worked at the prison when he testified, and 3) the Department did not control his diagnoses and medical opinions. We need not decide whether Doughty was a disinterested witness, however, because the testimony he offered was not uncontradicted. Indeed, as discussed in the text of this opinion, Williams offered medical evidence suggesting, contrary to Doughty's testimony, that the defendants' delay caused harm.

[3] Although our sister circuits have come to different conclusions about the need for verifying medical evidence in some contexts, *compare Laughlin*, 430 F.3d at 929 (requiring verifying medical evidence in all delayed treatment cases), *with Blackmore v. Kalamazoo County*, 390 F.3d 890, 898 (6th Cir. 2004) (stating that verifying medical evidence is required only in cases
(continued...)

## B.  Motion for New Trial

Next, the defendants claim that the paucity of verifying medical evidence required the district court to grant their motion for a new trial. This Court reviews the denial of a motion for a new trial for an abuse of discretion. *Davis*, 445 F.3d at 979. Because, as discussed above, the jury had a reasonable basis in the record for returning a verdict in favor of Williams, the district court did not err by denying the defendants' motion for a new trial.

## C.  Qualified Immunity

Finally, the defendants claim that they are entitled to qualified immunity because it was not clearly established that the defendants' delay in procuring Williams medical treatment violated his constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) (recognizing that officers are entitled to qualified immunity if they violated a constitutional right that was not clearly established). Specifically, the defendants claim that they could not have known that they could be found liable based on the kind of evidence Williams presented at trial. We reject this argument. Even if the law concerning verifying medical evidence was unclear at the time of the offense, the defendants are not entitled to qualified immunity. The purpose of qualified immunity is to shield public officers from liability where "a change in the law or . . . enduring legal uncertainty . . . makes it difficult for the officer to

---

[3] (...continued)
"involving minor maladies or non-obvious complaints of a serious need for medical care"), we need not decide whether this Court would require verifying medical evidence in all delayed treatment cases because we conclude that Williams offered sufficient verifying medical evidence in this case.

assess the lawfulness of the act in question *before* he does it." *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (emphasis added). Whether a delay in providing medical treatment has negatively affected a plaintiff's well-being is an assessment that is made in hindsight, so it cannot affect an officer's initial decision to seek treatment for an inmate. In other words, because the eventual presence or absence of verifying medical evidence cannot bear on an officer's decision to seek or deny treatment, it cannot provide a basis for immunity.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the jury's verdict in favor of Williams.

A true Copy:

      Teste:

              _____
              *Clerk of the United States Court of*
              *Appeals for the Seventh Circuit*