In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 14-3549

RYAN K. MATHISON,

*Plaintiff-Appellant,*

*v.*

SCOTT MOATS, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 12 C 1319 — **Joe Billy McDade**, *Judge.*

———————————

SUBMITTED JANUARY 19, 2016— DECIDED FEBRUARY 8, 2016

———————————

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* Ryan Mathison, an inmate at the Federal Correctional Institution in Pekin, Illinois, brought this *Bivens* suit against members of the prison staff and now appeals from the district court's grant of summary judgment in favor of the defendants.

At 3 a.m. one morning Mathison, who suffers from chronic high blood pressure, was awakened by excruciating

pain in his chest and left arm and other symptoms of a heart attack. He summoned a guard (defendant Wickman), to whom he explained his symptoms. The guard immediately summoned the supervising lieutenant (defendant Omelson), who in turn called the nurse on call (defendant Wall), who told the lieutenant that Mathison's condition was not an emergency. Having decided there was no emergency, Wall instructed Mathison (via Omelson) to go to the infirmary in the morning. Mathison went at 6:45 a.m.—almost four hours after he had suffered what was indeed a heart attack. The lieutenant had deferred to Wall's decision that there was no emergency.

Upon Mathison's arrival at the prison infirmary, however, the medical staff realized he had a serious problem, and after giving him tests and some drugs had him transported by ambulance to the nearest hospital emergency room, which was in Pekin but didn't have the necessary equipment or expertise to treat a serious heart attack and so had him taken immediately to a Peoria hospital to receive advanced cardiac care. There he received a stent placement and was diagnosed with a heart attack. He remained in the hospital for two days and then was returned to the prison.

His suit is against the guard he first summoned, the supervising lieutenant, the nurse on call, and the doctor who treated him in the prison infirmary. He charges them with deliberate indifference to a serious medical condition, the indifference consisting both of confining him to his cell for almost four hours after he awoke with severe pain and spoke to the guard on duty, and of not treating him in the infirmary until 8 a.m.—five hours after the onset of his heart attack. (He also sued the United States, under the Federal

Tort Claims Act, but he has not appealed from the district judge's dismissal of his FTCA claim.)

Defendant Moats, the prison doctor, declared in discovery that the delay in treating Mathison's heart attack had not caused damage to his heart. But he based this opinion mainly on what he'd been told by a doctor at the Peoria hospital, rather than on medical records.

Blood contains an enzyme called troponin; an elevated level of troponin signifies damage to the heart muscle. There are several tests for determining the level of troponin in a person's blood. See, e.g., Vinay S. Mahajan & Petr Jarolim, "How to Interpret Elevated Cardiac Troponin Levels," 124 *Circulation* 2350 (2011). The range in a healthy person, according to the test that was used to measure the level of troponin in blood drawn from the plaintiff in the emergency room at the Pekin hospital the morning he arrived, is zero to .07 ng/ml (nanograms per milliliter). The plaintiff's blood was found to contain .32 ng/ml of troponin that morning, which 9 hours later peaked at 33.8 ng/ml and about 9 hours after that dropped to 18.9 ng/ml.

In granting summary judgment in favor of the defendants, the judge remarked that as a prisoner Mathison was entitled only to "minimal care," as distinct from the medical care "he would receive if he were a free person, let alone an affluent free person." That may be true in general, but not in life and death situations. A prison inmate has a right to receive prompt medical treatment of a heart attack. *Williams v. Leifer*, 491 F.3d 710, 716 (7th Cir. 2007). Yet against the evidence that the normal range of troponin in a healthy heart does not exceed .07 ng/ml, the judge relied on Dr. Moats's

unsupported opinion that a level of .32 ng/ml is within the normal range.

Moats had made no effort through tests or an examination to determine whether Mathison's heart attack, exacerbated by the delay in treating it, had caused significant heart damage. That was excusable, however, because Moats is not a cardiologist—that is why an ambulance should have been summoned by Lieutenant Omelson given her suspicion that Mathison indeed was having a heart attack, and she doubtless would have summoned one had Wall advised her to do so when Mathison first complained of excruciating pain in his chest and left arm. But the fact that Moats is not a cardiologist is also a reason why the judge should not have credited his testimony that Mathison's troponin level was within the normal range. Cf. *Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015). And a further reason was that the .32 ng/ml troponin level was discovered in a test conducted six hours after the heart attack, though the level peaks on average 24 hours after the first symptoms of a heart attack. E.g., Brian P. Shapiro, *et al.*, "Cardiac Biomarkers," *Mayo Clinic Cardiology* 773, 774 (2007).

The defendants' lawyer thus was not justified in holding out Moats as an expert on cardiology and during discovery submitting an "expert report" by him stating that Mathison had suffered no damage to his heart. Moats was not qualified to offer such an opinion as evidence—and a medical report from a nurse practitioner who examined Mathison determined his troponin level to have been 18 ng/ml after the heart attack, contradicting Moats's statement that there could not have been damage to Mathison's heart because he hadn't had an elevated level of troponin.

As for the five hours during which (the defendants do not deny) Mathison experienced excruciating pain while awaiting treatment—pain that could have been alleviated by giving him oxygen, aspirin, and nitroglycerin (for his pain was quickly alleviated when Dr. Moats gave him those palliatives)—the judge ruled as a matter of law that the failure of treatment could not be evidence of deliberate indifference to a serious medical condition. The ruling had no basis in law or medicine. Delay in treating a heart attack "is a strong predictor for short-term survival rate and a surrogate for the amount of damaged myocardial [heart] tissue." Jerry Avorn, *et al*., "Therapeutic Delay and Reduced Functional Status Six Months After Thrombolysis for Acute Myocardial Infraction," 94 *Am. J. Cardiology* 415, 419 (2004). We held in *Williams v. Leifer*, *supra*, that a six-hour delay in administering nitroglycerin to treat an inmate's severe chest pain could create liability for deliberate indifference to an acute medical need.

Although the prison's treatment of Mathison's heart attack was incompetent, the guard whom Mathison summoned to his cell when the attack began (defendant Wickman) can't be thought to have exhibited deliberate indifference to Mathison's condition. For he immediately notified his superior, the supervisory lieutenant, as protocol required; he had no medical training that would have enabled him to do more for Mathison. Dr. Moats, though he should not have been allowed to testify as an expert witness, cannot be thought to have exhibited deliberate indifference to Mathison's plight either. He was not made aware of Mathison's condition until 8 a.m., and proceeded to give him emergency treatment and promptly summoned an ambulance to take him to the nearest hospital emergency room.

That leaves the supervisory lieutenant (Omelson) and the nurse (Wall). Wickman, the guard, had summoned Omelson to Mathison's cell when Mathison first alerted the guard to the excruciating pain in his chest and arm, and she talked to Mathison (without entering the cell) and told him it sounded as if he were having a heart attack. She then spent 20 minutes trying unsuccessfully to reach Nurse Wall. A heart attack is a life-endangering event, and Omelson had the authority to call 911 and summon an ambulance. She'd inferred from talking to Mathison that he was having a heart attack ("I do believe you're having a heart attack"), and that inference was a sufficient basis for making such a call given the difficulty she was having locating Wall. But if in doubt as to what to do, she should one imagines have called a doctor or a hospital emergency room for advice. Her failure to make such a call left Mathison in agony for almost five more hours. Cf. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

Wall claims to have concluded from Omelson's report (when Omelson finally reached him in the course of the night) of Mathison's symptoms that Mathison was not having a heart attack, even though Omelson told him that Mathison was experiencing acute pain in his chest and his left arm, which are classic symptoms of a heart attack. Wall could have told Omelson to call 911, or called Moats himself, but instead he relied on impressions that he gleaned from Omelson, who was not medically trained and who had learned of Mathison's symptoms only from talking to Mathison from outside his cell. Wall's behavior was thoroughly unprofessional—especially since, unlike Omelson, he was aware of Mathison's medical history, which included the fact that he was in the prison's chronic care program for

treatment of his chronic high blood pressure, a condition that creates an increased risk of a heart attack. See William B. Kannel, "Coronary Risk Factors: An Overview," *Cardiovascular Medicine* 1809, 1815–17 (1995).

There is more. Wall testified that after Omelson told him that Mathison was experiencing acute chest and arm pain, he asked Omelson some unspecified questions. Whether a nurse could accurately diagnose a heart attack on the basis of a second-hand account by a person with no medical training may be doubted, but in any event Wall has not explained what questions he asked; nor did he instruct Omelson to gather more information to help him ascertain whether Mathison needed immediate treatment. And just as with regard to Omelson, a professionally responsible reaction by Wall to Mathison's plight would have imposed no cost or risk on Wall. Cf. *Gayton v. McCoy*, 593 F.3d 610, 623 (7th Cir. 2010); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008).

And when Mathison arrived at the infirmary Nurse Wall remarked that he must be the inmate having the heart attack. This implies that Wall had concluded from talking with Lieutenant Omelson during the night that Mathison *was* having a heart attack. Yet Wall had nevertheless chosen to do nothing—further evidence of deliberate indifference.

The district judge said that Omelson's and Wall's inaction had not "denied Plaintiff the minimal civilized measure of life's necessities." We think that civilization requires more in a life and death situation, and are left to wonder what the judge thinks the minimum level of care is to which a prisoner who is suffering a heart attack is entitled.

We affirm the dismissal of the claims against Wickman and Moats, but reverse the dismissal of the claims against the other two defendants and remand the case for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED