In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3620

JOHN TOWNSEND,

*Plaintiff-Appellant,*

*v.*

SARAH COOPER, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:10-cv-00347-PJG — **Patricia J. Gorence**, *Magistrate Judge.*

ARGUED MAY 31, 2013 — DECIDED JULY 17, 2014

Before FLAUM, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* John Townsend was a prisoner at the Green Bay Correctional Institution ("GBCI"), a facility operated by the Wisconsin Department of Corrections ("DOC"). Townsend sued a number of officials at the Green Bay facility for violations of his civil rights under the Eighth and Fourteenth Amendments. The lower court granted summary

judgment in favor of the defendants. We affirm in part and vacate and remand in part.

## I.

On appeal from a grant of summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We must therefore credit Townsend's version of the facts at this stage. GBCI has procedures in place for inmates who violate prison rules. *See* Wis. Admin. Code (the "Code") §§ DOC 303.01 *et seq.* (the "rules governing inmate conduct under this chapter describe the conduct for which an inmate may be disciplined and the procedures for the imposition of discipline."). The extensive procedures that follow section DOC 303.01 govern how prison officials may enforce discipline in Wisconsin prisons. *See e.g.* Wis. Admin. Code. §§ DOC 303.69 & 303.70 (describing procedures for major penalties including adjustment segregation, program segregation and disciplinary separation). *See also* R. 63-9 (GBCI Segregation Unit Handbook).

The prison also has procedures for inmates who are mentally ill and pose a danger to themselves or others. *See* Wis. Admin. Code §§ DOC 311.01 *et seq.* That chapter provides "for an involuntary or voluntary nonpunitive status to be used for the temporary confinement of an inmate to ensure the inmate's safety and the safety of others if the inmate is mentally ill and dangerous, [or] is dangerous to himself or herself[.]" As with disciplinary infractions, the Code provides extensive procedures for placements for mental health reasons. *See e.g.* Wis. Admin. Code § DOC 311.04 ("Mental health placement").

The non-punitive status that GBCI employs is referred to as "observation status," a very restrictive status in which prison staff remove any property that the inmate could use to injure himself or others. *See* Wis. Admin. Code § DOC 311.14 ("Conditions of confinement while in observation"). For an inmate bent on self-destruction, this could include almost any property, and some Wisconsin inmates have proven morbidly creative in their use of common objects to harm themselves. *See e.g. Bowers v. Pollard*, 602 F. Supp. 2d 977, 981 (E.D. Wis. 2009) (behavior action plan applied to mentally ill inmate who repeatedly attempted to injure himself by inserting objects such as the teeth of a comb, fingernails, a piece of a milk carton and a piece of a mattress, into his penis).

Townsend presented complex challenges to the staff at GBCI because he suffered from significant mental illness and also engaged in disruptive behavior. The resulting actions that prison staff took to address his behavior were a blend of the two approaches. As we will see, though, the hybrid approach lacked procedural protections required by the due process clause and sometimes resulted in living conditions that did not meet the Eighth Amendment's standard for the minimal civilized measures of life's necessities. Under the hybrid approach, if an inmate at GBCI engages in "continual disruptive, destructive, assaultive or self-harming behaviors" and "regular measures" have "failed to correct the inmate's behavior," the prison's Segregation Review Committee implements a Behavior Action Plan ("BAP") for the inmate. According to the defendants, a BAP is an individualized plan that is designed to provide incentives for appropriate behavior. An inmate on a BAP faces restrictions on his property and

privileges; good behavior results in restoration of property and privileges, and "unstable" behavior is met with more severe restrictions. Although the prison characterizes a BAP as non-punitive, it also cites as the source of authority for the BAP the sections of the Wisconsin Administrative Code that provide for "Major penalties: adjustment segregation," and "Major penalties: program segregation and disciplinary separation." *See* Wis. Admin. Code. §§ DOC 303.69 & 303.70. Whether the BAP is punitive and whether it requires notice and an opportunity to object is one of the disputed issues in the case that we will address below.

According to a prison psychologist, Townsend had "multiple observation placements dating back to February 2004." R. 63-11, at 2. These placements were based on threats of self-harm and Townsend's inability to "contract for safety." In February 2004, for example, while housed in the general population, Townsend tried to hang himself from a light with a bed sheet. Beyond being placed on observation status, the record does not reveal how the prison responded to Townsend's February 2004 suicide attempt. In March 2005, Townsend again told prison staff that he wanted to kill himself. As a result, a prison psychologist, Dr. Steven Schmidt, placed Townsend on observation status on March 17, 2005. During the next three months, Townsend twice tried to kill himself and repeatedly expressed suicidal desires. Prison psychologists Dr. Todd Hamilton and Dr. Martha Breen-Smith regularly visited Townsend during this period and adjusted his living conditions to remove from his possession objects he could use to harm himself. For example, after trying to hang himself from a light fixture on May 24, 2005, his possessions were limited to

a blanket, a smock and a book. On May 26, he was released briefly from observation status only to be placed back on that status later that same day after again threatening to harm himself. On June 2, he was released from observation status but was found later with a sheet wrapped around his neck, resulting in a return to observation that same day. A few weeks later, when he removed a strip of Velcro from his smock and stated an intention to use it to hang himself, he was given a paper gown instead. At times, when staff deemed it safe, he was allowed to shower and was given soap, a towel and shower shoes for that purpose. Otherwise, while on observation status, Townsend's access to his property was very limited.

In May 2005, in the midst of multiple placements and releases from observation status, Dr. Schmidt conducted a "Review for Mental Health Placement" for Townsend. R. 63-11, at 1. Dr. Schmidt diagnosed Townsend as suffering from Post-Traumatic Stress Disorder ("PTSD"). He noted that Townsend had "multiple contacts with psychological services in the past," that he was generally cooperative and did not show signs of psychotic symptoms "except one time." He was at times agitated and dysphoric, and he reported to prison psychologists that events in the general population sometimes triggered memories that led to him acting out.[1] Dr. Schmidt

---

[1] According to the National Institute of Mental Health, "PTSD develops after a terrifying ordeal that involved physical harm or the threat of physical harm." Common symptoms of PTSD include re-experiencing the initial trauma, which is sometimes triggered by words, objects, or situations that are reminders of the event; avoidance, including both physically

(continued...)

noted in his report that Townsend had been placed on observation status twice in May 2005 after telling staff that he was depressed and wanted to hurt himself. Townsend had not been prescribed any psychotropic medications. Dr. Schmidt concluded that Townsend was looking for help, wanted to be helped, and was motivated to work with the staff at the Wisconsin Resource Center ("WRC"), a secure mental health facility for prisoners. On May 18, 2005, Dr. Schmidt therefore recommended an "urgent transfer" to the WRC for Townsend.

But Townsend was not transferred to that facility. Although the record does not reveal the reason that Dr. Schmidt's urgent request and recommendation was not carried out, at oral argument, counsel for the defendants stated that there was another inmate at the WRC with whom Townsend could not be placed.[2] Instead, on June 21, 2005, just weeks after Dr. Schmidt's urgent recommendation, Townsend was released

---

[1] (...continued)
staying away from reminders and also emotional symptoms such as numbness, guilt and depression; and hyperarousal, including being easily startled, feeling tense or "on edge," having difficulty sleeping, and having angry outbursts. Recognized treatments for PTSD include psychotherapy and medication. *See* http://www.nimh.nih.gov/health/topics/post-trau matic-stress-disorder-ptsd/index.shtml (last visited June 20, 2014).

[2] In response to the court's questions, counsel could not explain why the presence of a single inmate with whom Townsend had an unspecified conflict precluded him entirely from placement at the WRC. According to Townsend, whom we must credit on summary judgment, in February 2006, Breen-Smith told Townsend that he would never go to the WRC because she believed he was faking his symptoms and that there was nothing wrong with him.

from segregation status and on June 22, he was released from observation status and returned to the prison's general population.

Not surprisingly, his stay in the general population was short-lived. Within a day, he got into a fight with other inmates, and on June 23, 2005, he was placed in "temporary lock-up status." On June 24, he was placed in "control status" and given a paper gown.[3] On that same day, the Segregation Review Committee placed Townsend on a BAP. He was given a memorandum that described the terms of his first BAP:

> You have recently made threats to yourself and others. Additionally, your behavior has been very disruptive. Therefore, pursuant to the DOC Admin Cod 303.69 and 303.70, your property will be kept outside of your cell, due to safety and security concerns presented by allowing you to have it in cell.
>
> •Your cell will be searched two times a week.
>
> •You will be given a bag meal.
>
> •You will be taken out of your cell of [sic] Fridays to review mail, write letter, etc. You will be

---

[3] According to the defendants, an inmate is placed in "control status" when the inmate is behaving in a disruptive manner. During control status, the institution provides a mattress, light, toilet, sink, ventilation and heating, adequate clothing, essential hygiene supplies and nutritionally adequate meals, but otherwise maintains close control of the inmate's property. R. 48, at 16.

allowed one hour to perform these tasks. An officer will be present at all time.

•You will have a paper gown to wear.

•Upon request, you will be given a self-help book by clinical services.

•You will be given a segregation mattress.

•You will be given a shower on regular shower days. As appropriate, a towel and hygiene supplies will be provided to you prior to the shower. You will be expected to return all items after the shower.

No changes will be made in the plan without Lt. Swiekatowski, Program Supervisor Cooper, Dr. Hamilton and/or Dr. Breen's approval.

This plan will be reviewed on an ongoing and regular basis. Modifications will be made as appropriate, to include giving you more privileges and property as your behavior stabilizes, or taking more privileges and property if you become unstable.

R. 48-8. Twelve days later, the BAP was modified to change the segregation mattress to a regular mattress and to provide a "seg blanket." *Id*. With few changes, future BAP notices provided for similar conditions, sometimes allowing more property and privileges and sometimes imposing stricter constraints. When Townsend was placed on a BAP in November 2005, the notice specified "This plan will be reviewed on an ongoing and regular basis, there is no set date

that this will occur." R. 48-21. Townsend claimed that he was not always given all of the property or privileges specified in the BAP. No BAP provided any opportunity for a hearing or for Townsend to object. Other than general statements in each BAP that the plan would be reviewed "regularly," and that Townsend would receive adjustments to the restrictions based on stable or unstable behavior, there was no end date for any BAP and there was no specified way for Townsend to bring an end to the restrictions imposed under a BAP.

Between June 24, 2005 and March 31, 2006 (when he was transferred to another facility), Townsend was subjected to different BAPs for 259 days.[4] During that time, his property and privileges were severely constrained. For at least ninety of those days, he was either naked or issued only a paper gown or segregation smock. He was denied a regular mattress for 106 days, and was not allowed sheets or a pillow for almost the entirety of the BAP period. When he did not have a regular mattress, he slept on either a rubber mat or a concrete slab. Cold air blew into his cell from the ventilation system and Townsend was often very cold. He walked non-stop around his cell in an attempt to keep warm. He was allowed out of his cell for one hour per week to read his mail and write letters. He was not allowed access to toiletries or a towel for almost the entirety of his confinement under the BAP. That meant he had no toilet paper (or at times only a very small amount of toilet

---

[4] For brief periods of time, Townsend was released from the BAP. Thus, although 280 days elapsed between the first imposition of the BAP and Townsend's transfer to another facility, he was subjected to the BAP, by his own calculation, for 259 days.

paper), no soap to wash his hands, and no toothpaste or toothbrush. For 136 days, he was denied writing materials in his cell, and his access to books and mail was severely restricted. For a lengthy period, he was given his meals in a bag, to eat with his hands, rather than a meal tray with utensils that was provided to other prisoners. For a period of weeks (he does not specify how many), Townsend was entirely naked and provided with no clothing, bedding, linen, mattress or shoes.

At certain times during the BAP, he was also on observation status and, during those times, he was visited by Drs. Hamilton and Breen-Smith. According to Townsend, he kept hearing voices telling him to kill himself in order to end the pain and suffering he was experiencing on the BAP. But when he shared these thoughts with the psychologists, they told him that, because he was already naked and had nothing in his cell with which to harm himself, they were not worried about his suicidal thoughts. Sometimes the psychologists would laugh at Townsend and tell him that he was making things up so that he would be removed from the BAP. On March 31, 2006, Townsend was transferred to Columbia Correctional Institution.

Townsend then filed suit against a number of GBCI prison officials under 42 U.S.C. § 1983. He alleged that the defendants (1) violated his rights under the Fifth and Fourteenth Amendments by subjecting him to the BAP without due process; (2) deprived him of the minimal civilized measure of life's necessities while he was subject to the BAP, contrary to the Eighth Amendment; and (3) were deliberately indifferent to his serious medical needs, also in violation of the Eighth

Amendment. The district court granted summary judgment in favor of the defendants on all three counts. The court found that the BAP was not punitive but rather was implemented to protect Townsend from harming himself or others, and therefore no notice was required under the due process clause. The court also concluded that Townsend's conditions-of-confinement claim failed because the conditions were imposed for safety reasons and because Townsend could have ended the harsh conditions by simply behaving appropriately. Finally, the court determined that prison officials were not deliberately indifferent to Townsend's mental health issues but treated him appropriately. Townsend appeals.

## II.

On appeal, Townsend contends that the BAP was punitive and that due process required notice and an opportunity to object. He also asserts that the conditions to which he was subject under the BAP violated the Eighth Amendment prohibition against cruel and unusual punishment. Finally, he maintains that prison officials were deliberately indifferent to his serious medical needs when they failed to appropriately treat him and actually worsened his mental illness by subjecting him to conditions that they knew would exacerbate his depression and suicidal urges. Although Townsend initially sued a much larger group of employees of the DOC, he appeals only that part of the district court's decision that relates to Sarah Cooper (the Programs Supervisor of GBCI's Segregation Unit); William Swiekatowski (a supervising officer and lieutenant); Mark Zimonick (a Segregation Social Worker); Martha Breen-Smith (a psychologist); Todd Hamilton (another psychologist); and William Pollard (the warden of GBCI). He

does not appeal the district court's conclusion that other prison employees who were not personally involved in the harms he alleges may not be held liable under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (in a section 1983 suit, each government official is liable only for his or her own misconduct). The defendants do not deny that these remaining prison officials were personally involved in the decision to impose the BAP and implement its terms, but they do deny that the BAP conditions violated constitutional standards. We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Townsend and construing all reasonable inferences from the evidence in his favor. *Anderson*, 477 U.S. at 255; *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012); *Norman–Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Naficy*, 697 F.3d at 509.

## A.

We begin with the question of whether the imposition of the BAP without notice and an opportunity to object violated Townsend's due process rights, and the closely related question of whether the conditions of Townsend's confinement under the BAP violated his rights under the Eighth Amendment. There is a certain disconnect between the parties in their briefing of the legal issues related to the BAP. Townsend characterizes the program as entirely punitive; the defendants contend it was implemented for safety reasons. As

a factual matter, however, it appears that the BAP was implemented in response to both safety concerns and infractions of prison rules; at the very least, there are genuine issues of material fact regarding the reasons for implementing the BAP. Each party's characterization of the BAP heavily influenced how they briefed the issues. For example, the defendants contend that, because the BAP was not punitive, and because the BAP did not impose an atypical and significant hardship on Townsend, no opportunity to object was required before applying the program to Townsend. They also argue that Townsend did receive a notice of sorts; each time he was placed on the BAP or the terms were changed, he was given a description of the conditions that were to be imposed. The defendants appear to concede that the program was imposed without any opportunity to object. Townsend, in turn, argues that the BAP was entirely punitive and was implemented without due process. He does not address the conundrum that prison officials faced in dealing with a prisoner who was both mentally ill and willfully disruptive. Our analysis must necessarily account for the factual reality: Townsend was both mentally ill and repeatedly in violation of prison regulations.

To succeed on his Fourteenth Amendment due process claim, Townsend "must establish that he has a liberty interest in not being placed in the [BAP]—as it was administered to him—without procedural protections. It is undisputed that he received no procedural due process, so the claim turns on whether he can establish a liberty interest." *Gillis v. Litscher*, 468 F.3d 488, 491-92 (7th Cir. 2006). In *Sandin v. Conner*, 515 U.S. 472 (1995), "the Court explained that the Fourteenth

Amendment provides to inmates a liberty interest in avoiding transfer to more restrictive prison conditions if those conditions result in an 'atypical and significant hardship' when compared to 'the ordinary incidents of prison life.'" *Townsend v. Fuchs*, 522 F.3d 765, 768 (7th Cir. 2008) (quoting *Sandin*, 515 U.S. at 484-86). When a transfer to conditions meeting this standard occurs, the "prison must afford the inmate procedural protections before the transfer occurs." *Townsend*, 522 F.3d at 768 (citing *Sandin*, 515 U.S. at 487). Townsend therefore must demonstrate that the BAP imposed conditions resulting in an atypical and significant hardship compared to ordinary prison life.[5] He easily meets this standard.

---

[5] Due process applies when an inmate is subject to conditions that pose an atypical and significant hardship when compared to the ordinary incidents of prison life, and also when the conditions "exceed[] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Sandin*, 515 U.S. at 484 (citing *Vitek v. Jones*, 445 U.S. 480, 494 (1980) (holding that an involuntary transfer to a mental hospital for the purpose of psychiatric treatment implicated a liberty interest protected by the due process clause); and *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (holding that a prisoner possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment)). In *Vitek*, for example, the Court concluded that the "stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." 445 U.S. at 494. Under *Vitek* and *Washington*, an inmate subjected to conditions impinging a liberty interest for mental health reasons must still be afforded due process.

   The conditions imposed in *Gillis* were remarkably similar to those Townsend experienced. In *Gillis*, a different Wisconsin prison implemented a "Behavioral Modification Program," or a "BMP," for certain inmate infractions. Gillis was placed on a two-stage BMP for violating a rule that required him to sleep with his head at the back of his cell so that he would be visible to guards checking him through a small window on his door. In Stage One, "all property" was removed from his cell for three days and he was fed nutri-loaf for his meals. Stage One was extended two days for Gillis based on certain behaviors he exhibited during the first three days. In Stage Two, which generally lasted a minimum of seven days but could have been extended based on Gillis's behavior, he was allowed a segregation smock, hygiene items twice a day and showers on regular shower days. When prison officials said "all property" would be removed in Stage One, apparently they meant that all of his clothing, bedding and even basic hygiene items were removed. Gillis was left naked in his cell with a concrete slab for a bed, without soap or even toilet paper for all of Stage One and most of Stage Two on the BMP, for a total of twelve days. He was denied mail, visitors, phone privileges, canteen items, writing materials and access to the law library. He was allowed toilet paper on five occasions in those twelve days, four squares at a time. The segregation smock that he was allotted in Stage Two was a sleeveless poncho that covered his chest and groin. He was not issued underwear. At some point, he began to receive regular meals in Styrofoam containers and was allowed the use of toothpaste and a toothbrush, but was not given soap, bedding or a mattress. While on the BMP, Gillis began to hear voices telling him that people were trying to kill

him. He suffered panic attacks, palpitations, shortness of breath and a fear that he was about to die. He became suicidal and wrote the words "help me" in his own blood on the walls of his cell. At that point, he was placed on observation status but the conditions of the BMP did not change. 468 F.3d at 490-91.

As is the case with Townsend, in addition to a due process claim, Gillis also sued prison officials under the Eighth Amendment for conditions of confinement that constituted cruel and unusual punishment. That claim required a showing that the BMP imposed conditions that denied him "the minimal civilized measure of life's necessities." *Gillis*, 468 F.3d at 491 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Gillis also was required to demonstrate that the defendants acted with knowledge that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gillis*, 468 F.3d at 491.

In *Gillis*, we noted that life's necessities include shelter, heat, hygiene items and clothing. We cited cases where a lack of heat, clothing, sanitation, and bedding, alone or in combination, were found to violate the Eighth Amendment. *See Gillis* 468 F.3d at 493 (collecting cases). *See also Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (incarcerated persons are entitled to confinement under humane conditions which provide for their basic human needs, including adequate sanitation and hygienic materials). Although the defendants here deny that they subjected Townsend to these sorts of conditions, Townsend has created a

genuine issue of material fact regarding the conditions under which he was held with his own sworn statements. In addition to the conditions we described above, Townsend averred that he spent a period of weeks completely naked, with no clothing, shoes, bedding, linens, mattress, mail or legal materials. We found Gillis's claim sufficient to proceed to trial on both an Eighth Amendment conditions-of-confinement claim and a due process claim when he suffered similar conditions for twelve days, including five days in Stage One and seven days in Stage Two. Townsend endured these conditions in varying degrees for 259 days. We have held that "both the duration and the conditions of the segregation must be considered in the due process analysis; if the conditions of segregation were significantly harsher than those in the normal prison environment, 'then a year of [segregation] might count as a deprivation of liberty where a few days or even weeks might not.'" *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009). In *Marion*, we concluded that a term of segregation lasting 240 days required scrutiny of the actual conditions of segregation, especially in light of the decisions of other courts of appeals holding that periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions. 559 F.3d at 698-99 n.4 (collecting cases). In Townsend's case, both the duration of the BAP and the conditions imposed implicate liberty interests that require procedural protections. At a minimum, those protections should have included notice and an opportunity to object in some fashion.

As we noted above, to avoid summary judgment on his conditions-of-confinement claim, Townsend must also

demonstrate that the defendants acted in disregard of a substantial risk of serious harm to him. "Our review, though, convinces us that, on this issue as well, he must be allowed to proceed to trial." Gillis, 468 F.3d at 494. Townsend's BAPs did not provide end dates, and like Gillis's BMP, Townsend's BAPs did not specify how Townsend could bring an end to the obviously harsh conditions. Gillis, 468 F.3d at 493–94. Thus, the defendants' reliance on the Second Circuit's decision in Trammel v. Keane, 338 F.3d 155 (2d Cir. 2003), is unpersuasive for virtually the same reasons we explained in Gillis. See Gillis, 468 F.3d at 493–94.

Townsend has also raised a genuine issue of material fact regarding whether the BAP was imposed for safety reasons or as a disciplinary measure. Of course, safety and discipline are not mutually exclusive concerns. Townsend seems to concede as much by characterizing the BAP as a hybrid program. And Townsend, by his own admissions, presented both disciplinary problems and mental health issues to prison officials. Nothing precludes prison officials from addressing both concerns, even simultaneously. But as support for the imposition of the BAP, GBCI cited Wisconsin Administrative Code §§ 303.69 ("Major penalties: adjustment segregation"), 303.70 ("Major penalties: program segregation and disciplinary separation") and 303.71 ("Controlled segregation"). Sections 303.69 and 303.70 each specify that the penalty may not exceed the period specified in section 303.84 ("Sentencing procedure and schedule of penalties"). That section, as its title suggests, specifies penalties (including durations) "where an inmate is found guilty of one or more violations of the disciplinary rules." Wis. Admin. Code DOC § 303.84. The defendants concede that the BAP "has elements designed to enforce discipline," (Brief at 23) and

noted several times that the BAP was activated by Townsend's violations of prison rules. For example, the BAP was initially activated because Townsend got into a fight with other inmates, and then refused to enter his cell because he wanted to be housed closer to his brother. His second placement on the BAP followed several conduct reports for infractions such as refusing to return his lunch bag, refusing his meal tray, and covering his cell window. When he engaged in behaviors that were harmful to himself, the prison also used "observation status" to ensure his safety. Observation status, as we noted earlier, is governed by section DOC 311.14, "Conditions of confinement while in observation," and accompanying regulations. But when Townsend engaged in rules infractions unaccompanied by threats of self-harm, he was subjected to the BAP and endured severe property restrictions unrelated to his personal safety. Thus, Townsend has raised a genuine issue of fact regarding whether the BAP was imposed as discipline for violations of prison rules.

We note that, at times when Townsend was on the BAP, prison officials used observation status and the related procedures because Townsend posed a danger to himself or others. They also employed certain disciplinary procedures while Townsend was on the BAP for particular rules violations. In those instances where prison officials indisputably employed established procedures to address particular safety issues or disciplinary concerns, due process was satisfied. But they employed no due process for the additional restrictions occasioned by the BAP itself when it was arguably used as a punitive measure. In light of the remarkable similarity between the conditions imposed in *Gillis* under the BMP and Town-

send's BAP, we therefore conclude that the court erred in granting judgment in favor of the defendants on Townsend's due process claim and his Eighth Amendment conditions-of-confinement claim.

**B.**

All that remains is Townsend's claim against Drs. Hamilton and Breen-Smith for deliberate indifference to his serious medical needs. The Eighth Amendment imposes a duty on government officials to provide medical care to prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *see also Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007). Prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. *Estelle*, 429 U.S. at 104, *Gil*, 535 F.3d at 556; *Williams*, 491 F.3d at 714. "A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objectively, sufficiently serious.'" *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834). The defendants concede that Townsend had a serious medical need based on his severe mental illness.

To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834; *Greeno*, 414 F.3d at 653. In particular:

> The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference

> could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970. This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. *Walker*, 293 F.3d at 1037. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.

*Greeno*, 414 F.3d at 653. The defendants acknowledge that Drs. Hamilton and Breen-Smith were aware of Townsend's condition and the risk to his health. They contend, however, that Townsend has failed to raise a genuine issue of material fact regarding whether the prison psychologists disregarded the risk to Townsend's health. Instead, they point out that Drs. Hamilton and Breen-Smith repeatedly visited Townsend when he expressed any desire for self-harm. They regularly assessed and adjusted his access to property that he could use to harm himself, and they repeatedly placed him on observation status to ensure his safety when he was suicidal.

Townsend counters that the visits by Drs. Breen-Smith and Hamilton did not constitute treatment and that the psychologists actually aggravated his condition by placing him on the BAP. Specifically, he charges that they should have known about a January 2005 report produced by the Wisconsin Department of Corrections on "Treating Mentally Ill Inmates in Segregated Settings: A Report of the Segregation Work-group" (hereafter "Report"). According to Townsend, the Report concludes that segregation and removal of property "aggravates the condition of mentally ill patients." Townsend contends that Drs. Hamilton and Breen-Smith "inflicted" those

conditions on Townsend "despite clear contraindication from" the Report.

There are numerous problems with Townsend's analysis. First, as a factual matter, the Report does not state conclusively that segregation and the removal of property aggravate mental illness. Instead, the Report notes that the "scientific literature on the mental health effects of prolonged segregation is still incomplete and conflicting," but that "there is a growing consensus that inmates with psychological vulnerabilities can deteriorate if placed in settings that have significant social isolation and inactivity." R. 63-8, at 6. Second, the Report predates Townsend's placement on the BAP by fewer than six months, and Townsend has cited no evidence that Drs. Breen-Smith and Hamilton were even aware of the Report's conclusions, much less that they intentionally ignored them. Nor is there evidence that the prison psychologists would have been able, by themselves, to change prison policies in the months between the issuance of the Report and the imposition of the BAP.

Third, and perhaps most importantly, Townsend has cited no evidence that Drs. Breen-Smith and Hamilton displayed a conscious disregard of his needs. Any difference of opinion between Drs. Breen-Smith and Hamilton with Dr. Schmidt regarding the need to transfer Townsend to the WRC does not itself support a claim of deliberate indifference. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 797 (7th Cir. 2014). Nor does Dr. Breen-Smith's remark that Townsend was faking his symptoms in order to be released from the BAP support a conclusion that she was deliberately indifferent. *Rice*, 675 F.3d at 684 (sincere belief that inmate was malingering does not

support a conclusion that a nurse was deliberately indifferent to an inmate's medical needs). We recently noted that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment (and therefore the Fourteenth), depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement." *Rice*, 675 F.3d at 666. *See also Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994). But as in *Rice*, Townsend has failed to identify any alternatives open to the psychologists for keeping him safe during periods when he expressed suicidal wishes. Because Townsend presented no evidence that Drs. Hamilton and Breen-Smith were deliberately indifferent to his serious mental health needs, the district court did not err in granting summary judgment in favor of the defendants on that claim.

## III.

In sum, Townsend has raised genuine issues of material fact regarding whether (1) the imposition of the BAP violated his due process rights by imposing an atypical and significant hardship compared to the ordinary incidents of prison life, without appropriate notice and an opportunity to be heard; and (2) the BAP imposed conditions of confinement that denied Townsend the minimal civilized measures of life's necessities. We therefore vacate the judgment on those two claims and remand for further proceedings. On Townsend's Eighth Amendment claim for deliberate indifference to his serious medical needs, we affirm the district court's grant of summary judgment in favor of the defendants.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.