**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 13, 2016[*]
Decided May 18, 2016

**Before**

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-2403

| | |
|---|---|
| ANDREW WALDROP, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 12 C 6031 |
| WEXFORD HEALTH SOURCES, INC., | |
| *et al.* | Edmond E. Chang, |
| *Defendants-Appellees.* | *Judge.* |

## O R D E R

Andrew Waldrop, an Illinois inmate who has type I diabetes, challenges the grant of summary judgment against him in this action under 42 U.S.C. § 1983, in which he asserts that his Eighth and Fourteenth Amendment rights were violated when he received inadequate insulin from the medical staff at Stateville Correctional Center. We affirm in part and vacate and remand in part.

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(C).

Because the district court decided this case on a motion for summary judgment, we recite the facts in the light most favorable to Waldrop, the nonmoving party. *See Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016). Waldrop has type 1 diabetes mellitus, so his pancreas produces no insulin, which is necessary to process sugar. When his blood sugar becomes too low, he frequently suffers attacks in which he becomes disoriented and cannot identify his surroundings, his communication skills slow down, and he has trouble responding to people. For nearly 40 years Waldrop has depended on daily insulin injections to manage his diabetes.

While imprisoned at Stateville, Waldrop received injections twice daily. The morning dose was fixed according to a standing prescription, and the evening dose varied along a sliding scale based on his blood sugar levels. A nurse would bring to Waldrop's cell his insulin and an Accu-Chek glucose meter, a device that measures blood sugar levels through a prick of the finger. Waldrop would use the Accu-Chek to test his blood sugar, show the reading to the nurse, and the nurse would provide an appropriate dose of insulin that Waldrop himself would inject. Waldrop sometimes refused to use the Accu-Chek because it caused him pain.

In November 2011, Waldrop filed a grievance against an administering nurse, Adrienne Miller, after she withheld his insulin when he refused to perform the Accu-Chek test. (She was concerned that an excessively high insulin dosage could trigger fatal consequences.) Waldrop complained that he had a right to refuse any part of his medical treatment, including the Accu-Chek test, and that any such refusal should not preclude him from receiving insulin. When Waldrop received no response to his grievance and no assurance that he would continue to receive his insulin, he wrote a letter to the Acting Director of the Illinois Department of Corrections blaming Anna McBee, a grievance officer at Stateville, for not responding. In March 2011, Waldrop was notified by the Administrative Review Board, (which reviews reports and recommendations of grievance officers,) that the grievance had been resolved and Miller had been informed that she could provide insulin to inmates without a preliminary Accu-Chek reading.

Waldrop filed a second and third grievance in November 2011—one complaining that Waldrop had to administer his insulin in the presence of a correctional officer, the other complaining that his future medical treatment had been conditioned inappropriately on his seeing a psychologist. Both grievances were reviewed by Delores Trevino, a nurse supervisor, who summarized Waldrop's medical care in a memorandum. Based on this memorandum, McBee issued a report recommending that the grievances had been resolved, and the Administrative Review Board denied both.

That same month Waldrop filed a fourth emergency grievance, alleging that Dr. Anton Dubrick, a physician at the prison, had canceled his insulin and prescribed him a pill (Glipizide) that was ineffective. Waldrop complained that the pill would work only if his pancreas still produced insulin, which it did not, and he requested that he be prescribed insulin. According to Waldrop, the fourth grievance stemmed from a check-up on November 10 with Dr. Dubrick, who did not perform the usual examination for signs of diabetes complications (such as checking Waldrop's blood circulation, feet, eyes, breathing, and sites on his fingers where the Accu-Chek is administered). And Dr. Dubrick discussed Waldrop's medical conditions within earshot of other medical staff, inmates, and officers. Frustrated by both the lack of privacy and insufficient examination, Waldrop told Dr. Dubrick what checks he ought to perform and refused to see him anymore. Afterwards Dr. Dubrick wrote in his medical notes that he questioned Waldrop's competency and he no longer could safely manage Waldrop on insulin. Dr. Dubrick cancelled Waldrop's insulin prescription and prescribed daily Glipizide pills.[1] Dr. Dubrick did not tell Waldrop that his diabetes was uncontrolled and that his treatment had been changed. Several days later, after he had not received his usual insulin, Waldrop learned from a medical technician that Dr. Dubrick had cancelled his insulin and prescribed the Glipizide.

Without insulin, Waldrop experienced frequent urination, dry mouth and vomiting, and he had to limit his eating so that his blood sugar would not get too high. When his sugar level rose too high, his legs felt like "jelly." Waldrop complained to a nurse that he needed insulin because he had been vomiting and had elevated blood pressure. His blood sugar reading had spiked to more than 300 mg/dL; his normal levels ranged between 100 and 200 mg/dL. The nurse immediately called Dr. Imhotep Carter, the prison's medical director, who prescribed an emergency dose of insulin.

In March 2012 Cynthia Garcia, a nurse, reviewed Waldrop's fourth grievance and filed a memorandum that said Waldrop was currently on insulin. McBee, the grievance officer, recommended that the grievance was resolved because Waldrop was receiving appropriate medical care. In late March 2012 (over four months after Waldrop filed the emergency grievance), the Administrative Review Board informed Waldrop that his grievance was denied.

---

[1] Glipizide is an oral medication that lowers blood sugar by causing the pancreas to produce insulin. *See* Nat'l Library of Med, MedlinePlus, "Glipizide," *available at* https://www.nlm.nih.gov/medlineplus/druginfo/meds/a684060.html (last visited May 13, 2016)). We refer to the National Library of Medicine merely as a reference aid to provide context for Waldrop's medical treatment.

Later in November Waldrop filed two more grievances. In a fifth grievance, he complained that Dr. Carter had lowered his insulin dosage to a level below that recommended by the American Diabetes Association. And in the sixth grievance, he complained that Dr. Carter had him confined in isolation in the infirmary against his will for four days. Waldrop had been admitted to the infirmary shortly after Dr. Dubrick canceled his insulin and Dr. Carter prescribed an emergency dose, and while he remained there, he received insulin twice a day. But he argued with the nurses that his insulin dosages should be higher. And at one point, he refused his food and insulin dose because he was angry that Dr. Carter had not seen him yet. His blood sugar levels reached 500 mg/dL during his stay at the infirmary.

Four months later, Garcia reviewed the grievance and prepared a memorandum summarizing Waldrop's medical care. Then McBee, the grievance officer, recommended that the grievances were resolved because Waldrop was receiving appropriate care. The Administrative Review Board denied both grievances in March 2012.

In July 2012, Waldrop brought this deliberate-indifference suit against Wexford Health Sources, the private organization that provides medical care at Stateville; its employees Drs. Carter and Dubrick and nurses Garcia and Miller; as well as state employees McBee, Trevino, and an unidentified correctional officer (the subject of his second grievance). He asserted that the individual defendants disregarded his serious medical needs as a diabetic and that Wexford had a policy that encouraged its employees to deny medical treatment.

The district court granted the defendants' motions for summary judgment. First, regarding Waldrop's claims against McBee, Trevino, and Garcia, the court determined that Waldrop had not exhausted his administrative remedies against them specifically. Waldrop did not name any of the defendants in his grievances, the court explained, nor describe facts that might suggest that they were the subject of his complaints. Although Waldrop urged that he "impliedly" complained about these three individuals by virtue of their role in reviewing his grievances, the court pointed out that the Prison Litigation Reform Act required him to be as specific as possible about any individuals involved and to give descriptive information about "what happened, when, where" and by whom. And even if Waldrop's claims against McBee, Trevino, and Garcia were not precluded on exhaustion grounds, the court added, Waldrop presented no evidence from which deliberate indifference on the part of these three individuals could be inferred.

Regarding Waldrop's claims against Miller, Dr. Dubrick, and Dr. Carter, the court found no triable issue about whether their conduct amounted to deliberate indifference.

The court noted that there was no question that denying a diabetic insulin could be an objectively serious deprivation, but determined that Waldrop had presented no basis for a jury to infer that any of these three individuals subjected him to a substantial risk of harm. The court added that the individual defendants in any event would be entitled to qualified immunity because there was no basis for a jury to conclude that they were committing any constitutional violations. And finally, the court granted summary judgment to Wexford because Waldrop had not produced any evidence to show that it had a custom or policy of denying inmates necessary insulin.

On appeal Waldrop first challenges the district court's conclusion that he did not exhaust his administrative remedies with respect to McBee, Trevino, and Garcia. He admits that he did not file a grievance against any of them and that they never provided him medical care, but maintains that he was not required to name them explicitly because they already knew of his dissatisfaction with the handling of his grievances based on their personal involvement reviewing them.

The district court correctly determined that Waldrop had not exhausted his remedies because he was required to file separate complaints naming each defendant. Separate complaints are required if the underlying facts or complaints are different, *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013), and the underlying facts of Waldrop's claims against the defendants differ—Waldrop claims that McBee, Trevino, and Garcia did not timely review his grievances, whereas he claims that the other defendants were deliberately indifferent to his need for insulin.

Waldrop next argues that the court ignored disputed issues of fact regarding whether Miller, Dr. Dubrick, and Dr. Carter had disregarded the substantial risk that he would be harmed by the denial of insulin. With regard to Miller, the nurse who denied him insulin on one occasion when he refused the Accu-Chek test, Waldrop asserts that the lack of insulin could have caused damage to his internal organs. But as the district court explained, Waldrop did not submit any evidence of a risk of harm from this single episode from which a jury could infer deliberate indifference. Contrary to Waldrop's suggestion that Miller intended for her denial of insulin to put him at risk of harm, the undisputed record evidence reflects that Miller hoped to mitigate possible harm: she testified that an excessive dose of insulin could be fatal and, not knowing his blood sugar levels on that occasion, she worried about the risks of providing any insulin.

Waldrop next argues that the district court erred in finding that Dr. Carter did not subject him to a substantial risk of harm by lowering his insulin dosage while he was treated in the infirmary. But Waldrop's contentions, unsupported by evidence, cannot refute Dr. Carter's medical judgment about proper diabetes management. Waldrop must

introduce evidence so as to allow a reasonable juror to find that Dr. Carter's decision to prescribe low doses of insulin was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that" Dr. Carter "actually did not base the decision" on medical judgment, *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks and citations omitted), and this he has not done.

Waldrop next contends that the district court erred in two respects in its analysis regarding Dr. Dubrick. He first asserts that the district court ignored his evidence that he was exposed to—and actually suffered—an objectively serious harm when Dr. Dubrick canceled his prescription for insulin injections and substituted Glipizide. *See Townsend v. Cooper*, 759 F.3d 678, 688–89 (7th Cir. 2014) (describing the objective and subjective components of a deliberate indifference claim).

Although the district court acknowledged that denying insulin to a type 1 diabetic constitutes a serious risk of harm, it erred when it found that Waldrop failed to present evidence that he was actually exposed to that risk. The district court relied on Dr. Dubrick's testimony that Glipizide could serve as a short-term alternative to insulin, but it did not acknowledge Dr. Carter's countervailing views that that type 1 diabetics "absolutely require insulin" because they "can no longer manufacture their own insulin" and they "cannot survive without it." Contrary to Dr. Dubrick's assertion that pills are an alternative to insulin, Dr. Carter said that Glucophage treatment and other pills are "not a substitute" for insulin injections, and "[t]here is no science behind that [substitution]." [2] If we credit Dr. Carter's testimony in Waldrop's favor, as we do at summary judgment, then type 1 diabetics simply do not produce insulin. Thus a pill like Glipizide—which encourages insulin production—constitutes no treatment at all of a type 1 diabetic's condition. There is evidence (which the district court did not

---

[2] For general background to Dr. Carter's testimony that a pill cannot replace insulin for type 1 diabetics, we referred to the Physicians' Desk Reference and the National Library of Medicine, which explain how Glipizide works. *See* Physicians' Desk Reference, "Glipizide," *available at* http://www.pdr.net/ drug-summary/Glipizide-glipizide-3526.1620 (last visited May 13, 2016) (Glipizide is contraindicated for type 1 diabetes); Nat'l Library of Med., MedlinePlus, "Glipizide," *available at* https://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684060.html (last visited May 13, 2016). According to the National Library of Medicine, Glipizide is used to treat type 2 diabetes, "a condition in which the body does not use insulin normally." Nat'l Library of Med., MedlinePlus, "Glipizide". Glipizide "lowers blood sugar by causing the pancreas to produce insulin … and helping the body to use insulin efficiently." *Id.* But "Glipizide is not used to treat type 1 diabetes," according to the Library, because type 1 is a "condition in which the body does not produce insulin." *Id.* We cite to medical reference aids for context only to understand Dr. Carter's testimony; information obtained from those aids does not influence the resolution of this case.

acknowledge) that, as a result of the insulin withdrawal, Waldrop suffered actual harm of insatiable thirst, frequent urination, elevated blood pressure, and vomiting such that he had to be administered an emergency dose of insulin and admitted to the infirmary for several days. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (hospital stay of several days resulting from insulin withdrawal was "sufficiently serious" medical need).

Waldrop raises a second challenge to the court's analysis regarding Dr. Dubrick— that he presented sufficient evidence to create a fact question whether Dr. Dubrick was subjectively aware of—and disregarded—the risk of harm to a type 1 diabetic who does not receive regular insulin. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Waldrop points out that Dr. Dubrick was aware of the risk of insufficient insulin because he testified that "really sick" type 1 diabetics may present acute symptoms, including "so-called ketoacidosis with vomiting, unstable vital signs, severe dehydration." And Dr. Dubrick testified to knowing that, if left untreated, type 1 diabetes may cause serious long-term consequences for the "circulation, kidneys, eyes." From this testimony, contends Waldrop, a jury could infer that Dr. Dubrick was deliberately indifferent when he disregarded those risks by canceling Waldrop's insulin injections and prescribing Glipizide, which does not treat type 1 diabetes. *See Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001) (officer's knowledge that diabetes can be fatal, coupled with decision to deprive arrestee of insulin, permits jury inference of deliberate indifference); *cf. Ortiz v. City of Chicago*, 656 F.3d 523, 534 (7th Cir. 2011) (remanding where plaintiff showed that officers failed to provide any medical care for diabetic detainee despite awareness that diabetic condition required care).

Dr. Dubrick characterizes Waldrop's argument as nothing more than a disagreement over possible treatments, which is insufficient to show deliberate indifference. But the disparity between the testimony of Dr. Carter and Dr. Dubrick about the appropriateness of Glipizide for treating type 1 diabetes amounts to more than mere disagreement. Dr. Carter's testimony could permit an inference that Dr. Dubrick's medical decision to prescribe Glipizide was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Smego v. Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) (explaining that a "physician is deliberately indifferent when he persists in an ineffective treatment"); *cf. Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (same).

Waldrop also contends that the Wexford defendants are not entitled to a defense of qualified immunity. He points out that clearly established law prohibits the

defendants from denying insulin to a diabetic. The defendants have not persisted in that defense on appeal, nor do we think they could. *See Egebergh*, 272 F.3d at 926 (denial of qualified immunity appropriate where jury could infer that defendants were deliberately indifferent to type 1 diabetic plaintiff's need for insulin); *see also Currie v. Chhabra*, 728 F.3d 626, 631–32 (7th Cir.2013) (affirming denial of qualified immunity for private health care providers for jail).

We end by noting that Waldrop's claim about the ineffectiveness of his appointed counsel is meritless. He asserts that his lawyer failed to subpoena all his medical records or to depose witnesses who would have supported his claim against Miller. But Waldrop has no constitutional or statutory right to counsel in this case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir.2014), and thus no right to effective counsel, *Stanciel v. Gramley*, 267 F.3d 575, 580–81 (7th Cir. 2001).

Accordingly, the judgment in favor of Defendant Dubrick is VACATED, and the case is REMANDED for further proceedings as to that defendant. In all other respects the judgment is AFFIRMED.